## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

UNITED STATES OF AMERICA, ex rel.
Norman Rille and Neal Roberts,

        Plaintiff/Relator,

    v.

ELECTRONIC DATA SYSTEMS
CORPORATION, a Delaware Corporation; SUN
MICROSYSTEMS, INC., a Delaware
Corporation; and DELL INC., a Delaware
Corporation,

        Defendants.

Case No. 04-04 CV986GTE

---

SUN MICROSYSTEMS, INC.
a Delaware Corporation,

        Counterclaim-Plaintiff,

    v.

UNITED STATES OF AMERICA,

        Counterclaim-Defendant.

---

## ANSWER AND COUNTERCLAIMS OF
## SUN MICROSYSTEMS INC.
## TO COMPLAINT IN INTERVENTION

### Answer

Defendant Sun Microsystems Inc. ("Sun") hereby answers the allegations set

forth in Plaintiff's Complaint in Intervention of the United States as follows:

1.      Paragraph 1 does not allege any factual allegations to which a response is required.  To the extent that a response is deemed required, the allegations are denied.

2.      Paragraph 2 sets forth legal conclusions to which no response is required.  To the extent that a response is deemed required, the allegations are denied.

3.      Paragraph 3 sets forth legal conclusions to which no response is required.  To the extent that a response is deemed required, the allegations are denied.

4.      Sun admits that the United States of America has filed a complaint in intervention in this action.

5.      Sun admits that it is a Delaware Corporation headquartered in Santa Clara, California, and that it has sold some of its products and/or services in the State of Arkansas.  Sun denies that it sells products to the U.S. government in that Sun's GSA contracts are entered into by Sun Microsystems Federal, Inc., a wholly owned subsidiary of Sun.  For purposes of this Answer and Counterclaim, we interpret Sun to mean Sun Microsystems Federal, Inc.  Sun admits that it has entered various business agreements with entities that may sell Sun's products to the United States government.  The terms of these agreements speak for themselves.  Absent a definition of Alliances, Alliance Teams, Alliance Partnerships and Affiliate, Sun is without sufficient information to admit or deny whether it has established such relationships and denies the remaining allegations in Paragraph 5.

6.      Paragraph 6 sets forth legal conclusions to which no response is required.  To the extent that a response is deemed required, Sun states that the False Claims Act speaks for itself and denies any characterization thereof.

7.      Sun is without sufficient knowledge or information to admit or deny the allegations set forth in Paragraph 7.

8.     Sun is without sufficient knowledge or information to admit or deny the allegations set forth in Paragraph 8.

9.     Sun is without sufficient knowledge or information to admit or deny the allegations set forth in the first sentence in Paragraph 9.  The second sentence in Paragraph 9 sets forth legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

10.     Sun admits on information and belief that the U.S. government purchases information technology systems and enters into various contracts related thereto and is otherwise without sufficient knowledge or information to admit or deny the remaining allegations set forth in Paragraph 10.

11.     Sun is without sufficient knowledge or information to admit or deny the allegations set forth in Paragraph 11.

12.     Sun admits that it has entered into various business agreements with other companies and absent further definition denies the remaining allegations in Paragraph 12.

13-15. Denied.

16.     The allegations in Paragraph 16 state legal conclusions that do not require a response.  To the extent a response is deemed to be required, Sun admits that it entered into contracts numbered GS-35F-4547G and GS-35F-0702J with GSA, states that the terms of these agreements speak for themselves and denies any characterization of those contracts set forth in Paragraph 16.

17.     Admit.

18.     Sun admits that it entered into various business agreements with other entities during the Relevant Time Period and states that the designations assigned to those

agreements and their terms speak for themselves.  In the absence of a definition of Master

Alliance Agreement, Sun is without sufficient knowledge to admit or deny that agreements were

made "under Sun's Master Alliance Agreement."  Sun denies the remaining allegations of

Paragraph 18.

19.    Sun admits that it entered into numerous agreements that allowed other

entities to resell Sun's products to the U.S. government.  To the extent specific examples are

listed in Paragraph 19, those contracts speak for themselves.

20.    Sun admits that during relevant time periods, it had various business

programs and agreements in place to benefit Sun and otherwise denies the remaining allegations

of Paragraph 20.

21.    Sun admits that the government reseller channels have a role in meeting

demands for Sun products and denies the remaining allegations in Paragraph 21.

22.    Sun admits that it makes payments pursuant to certain agreements with

third parties.  The remaining allegations set forth in Paragraph 22 are denied.

23.    Sun admits that it made payments termed "influence fees" during the

relevant time period but denies that it made any payments to improperly influence a government

customer's selection of a Sun product.  The remaining allegations set forth in Paragraph 23 are

denied.

24.    Denied.

25.    Sun admits that influence fees, to the extent paid, if any, were paid only in

instances where a transaction was completed but denies that any payments were made to

improperly influence government agencies to make such purchases.

26.    Denied.

27.     The allegations in Paragraph 27 state legal conclusions that do not require a response.  To the extent a response is deemed to be required, Sun states that the contracts referenced in Paragraph 27 speak for themselves and Sun denies any characterization thereof.

28.     Paragraph 28 states a legal conclusion that requires no response.

29.     Sun denies that it paid influence fees in return for improper influence or improper favorable treatment on federal government contracts for products and services.

30.     Sun admits on information and belief the fact of a payment of $18,139.40 to PricewaterhouseCoopers on July 27, 2001, and otherwise denies the remaining allegations of Paragraph 30.

31.     Sun admits the fact of two payments to Accenture/Proquire and otherwise denies the remaining allegations of Paragraph 31.

32.     The Complaint fails to specify the nature of the alleged payments.  Sun admits that during the relevant time period, it made certain payments to WWT, but Sun denies that any payments were made for improper purposes.

33.     Sun is without sufficient knowledge or information to admit or deny the allegations set forth in Paragraph 33.  To the extent a response is deemed required, the allegations are denied.

34.     Sun admits that it made payments pursuant to the Government Target Rebate Program ("GTARP") and is without sufficient knowledge or information to admit or deny the remaining allegations of Paragraph 34 because the meaning of the term "Alliance Benefits" is unclear.

35.     Sun denies this characterization.

36.     Sun admits that it paid GTARP payments to resellers who sold Sun products to the government.  Sun further states that such payments were based on total volume sales.  Sun denies the remaining allegations in Paragraph 36.

37.     Denied.

38.     Sun admits that it did not disclose the amounts of these payments to the federal government but states on information and belief that the Program was known to the government and that responsibility, if any, for disclosure of specific amounts to the government was the responsibility of resellers.

39.     Admit.

40.     Sun admits it made payments pursuant to the Competitive Knock-Out Program and otherwise denies the remaining allegations of Paragraph 40.

41-44. Denied.

45.     Sun admits certain payments were made to the named companies in this period and otherwise denies the remaining allegations of Paragraph 45.

46.     Sun admits that during this period payments were made to third parties under the GTARP and Competitive Knock-Out Programs and otherwise denies the remaining allegations of Paragraph 46.

47-52. Denied.

53.     Denied.

54.     Admit.

55.     Admit.

56.     Admit.

\\\DC - 080653/000040 - 2569268 v6

57.     Sun admits that after October 1, 1997, Contract GSA 4547G included SINs 132-50 (Classroom Technology); 132-51 (Information Technology Professional Services); 132-12 (Maintenance and Repair); and 132-34 (Maintenance of Software). In all remaining aspects, Sun denies the factual allegations set forth in Paragraph 57.

58.     Admit.

59.     Admit.

60.     Admit.

61.     Admit.

62.     Sun admits the allegations set forth in the first sentence of Paragraph 62 and denies the allegations set forth in the second sentence of Paragraph 62.

63.     Sun admits the allegations set forth in the first sentence of Paragraph 63. Sun admits that, consistent with GSA regulations, offerors agree to disclose their commercial pricing policies or practices in accordance with GSA's instructions or the offeror's own format. Sun denies the remaining allegations set forth in Paragraph 63.

64.     Sun admits that it sold over $200 million of products and services directly to the government under GSA contracts numbered GS-35F-4547G and GS-35F-0702J. Sun denies any and all remaining allegations set forth in the first sentence of Paragraph 64 and denies all allegations set forth in the second sentence of Paragraph 64.

65.     The allegations in Paragraph 65 state legal conclusions that do not require a response. To the extent a response is deemed to be required, Sun states that the GSA regulations cited in Paragraph 65 speak for themselves and denies any and all characterization of the GSA regulations set forth in Paragraph 65.

\\\DC - 080653/000040 - 2569268 v6

66.     Sun is without sufficient information to admit or deny the allegations in the first sentence of Paragraph 66. The second sentence of Paragraph 66 states legal conclusions that do not require a response. To the extent a response is deemed to be required, Sun states that the GSA regulations cited in Paragraph 66 speak for themselves and denies any and all characterization thereof.

67.     The allegations in Paragraph 67 state legal conclusions that do not require a response. To the extent a response is deemed to be required, Sun states that the *Federal Register* notice cited in Paragraph 67 speaks for itself and denies any and all characterization thereof.

68.     Sun is without sufficient knowledge or information to admit or deny the allegations set forth in Paragraph 68.

69.     The allegations in Paragraph 69 state legal conclusions that do not require a response. To the extent a response is deemed to be required, Sun states that the MAS contract language and the GSA regulations cited in Paragraph 69 speak for themselves and denies any and all characterization thereof.

70.     Denied.

71.     Sun is without sufficient knowledge or information to admit or deny the allegations set forth in Paragraph 71.

72.     Denied.

73.     Denied.

74.     Admit such a letter was sent and that the letter speaks for itself.

75.     Sun admits that the September 11, 1997 letter from Sun to GSA provided a description of Sun's commercial sales practices or policies and that a chart titled "Commercial

Practice Chart" was attached thereto and denies all other allegations set forth in the first and second sentences of Paragraph 75. Sun states that the third sentence of Paragraph 75 states legal conclusions that do not require a response. To the extent a response is deemed to be required, Sun states that the GSA regulations speak for themselves and denies any and all characterization thereof.

76.     Denied.

77.     Sun is without sufficient knowledge or information to admit or deny the allegations set forth in Paragraph 77.

78.     Denied.

79.     Denied.

80.     Sun is without sufficient knowledge or information to admit or deny the allegations set forth in Paragraph 80.

81.     Sun is without sufficient knowledge or information to admit or deny the allegations set forth in Paragraph 81.

82.     Denied.

83.     Sun admits that on multiple occasions between January and August 1999, Sun sent written correspondence to the GSA relating to Sun's commercial sales practices or policies. Sun admits that some of this correspondence was drafted in response to requests for information from the GSA contracting officer in the course of negotiating GSA Contract 0702J. Sun denies all additional allegations set forth in Paragraph 83.

84.     Denied.

85.     Sun admits that a January 26, 1999 letter conveyed information regarding its commercial sales practices or policies to the GSA. Sun states that the letter referenced in

Paragraph 85 speaks for itself, and denies any characterization of the document set forth in Paragraph 85.

86.     Sun admits that a March 15, 1999 letter to the GSA discussed Sun's channels of distribution, discounts offered to original equipment manufacturers ("OEMs") and discounts offered to volume end users ("VEUs"). Sun states that this letter speaks for itself and denies any characterization of this letter set forth in Paragraph 86.

87.     Sun admits that an April 15, 1999 letter from Sun to the GSA bears a subject line reading "Clarification of Discounts Reflected on the Sun Commercial Sales Information." Sun states that this letter speaks for itself, and denies any characterization of the document.

88.     Sun admits that a June 30, 1999 letter from Sun to the GSA bears the subject line "Clarification of Discounts Reflected On the Sun Commercial Sales Information Provided on June 25, 1999." Sun denies any and all additional allegations set forth in Paragraph 88.

89.     Admit.

90.     Denied.

91.     Admit, except to state that the July 13, 1999 letter speaks for itself.

92.     Sun admits that a letter dated July 29, 1999 from Sun to the GSA bears the subject line "Request for Additional Information" and provides information relating to certain VEU agreements. Sun states that this letter speaks for itself, and denies any characterization of it set forth in Paragraph 92.

93-97. Denied.

\\\DC - 080653/000040 - 2569268 v6

98.     Sun admits on information and belief that certain entities that resell Sun products have GSA schedules of their own and is otherwise without sufficient information to admit or deny the remaining allegations of Paragraph 98.

99.     Denied.

100.    Denied.

101.    Denied.

102.    Sun admits that Contract Modification 54 added SINs 132-12, 132-34, 132-50 and 132-51 from Contract Numbers GS-35F-4547G to GS-35F-0702J.  Sun states that Contract Modification 54 speaks for itself regarding the discounts offered therein and denies any and all remaining allegations set forth in Paragraph 102.

103.    Denied.

104.    Admit.

105.    The September 4, 2002 letter speaks for itself.  Sun admits GSA issued Modification 54, which speaks for itself.

106.    Sun admits that at the time of Modification 54, the GSA-negotiated discount for 132-12 (Maintenance and Repair) items, which related to neither an E10000 Server nor Repair, was 32%.  Sun admits that the GSA-negotiated discount for 132-34 (Software Maintenance) items was also 32%.  Sun denies the remaining allegations set forth in Paragraph 106.

107.    Sun admits that a September 4, 2002 letter from Sun to GSA contained information relating to Sun's commercial sales practices or policies and that multiple charts titled "Commercial Practice Chart" were attached thereto.  Sun states that the letter referenced in Paragraph 107 speaks for itself,  and denies any further characterization of the document.

\\\DC - 080653/000040 - 2569268 v6

108.    Denied.

109.    Sun denies the allegations set forth in the first sentence and states that it has insufficient information to admit or deny the allegations of the second sentence. The MAS contracts speak for themselves.

110.    Sun admits that the Price Reduction Clause is designed to preserve the agreed upon relationship between the price offered to GSA and the basis of award customer(s) agreed to by the parties, including any agreed to exclusions. Sun denies the remaining allegations set forth in Paragraph 110.

111.    Denied.

112.    Denied.

113.    Denied.

114.    Denied.

115.    Denied.

116.    Sun repeats its answers to Paragraphs 1 through 115, as if fully set forth herein.

117.    Denied.

118.    Denied.

119.    Denied.

120.    Denied.

121.    Sun repeats its answers to Paragraphs 1 through 120, as if fully set forth herein.

122.    Sun admits that Count II purports to state a claim under the Anti-Kickback Act.

- 12 -

123.   Denied.

124.   Denied.

125.   Denied.

126.   Denied.

127.   Denied.

128.   Sun repeats its answers to Paragraphs 1 through 127, as if fully set forth herein.

129.   Denied.

130.   Denied.

131.   Denied.

132.   Sun repeats its answers to Paragraphs 1 through 131, as if fully set forth herein.

133.   Denied.

134.   Denied.

135.   Denied.

136.   Denied.

137.   Sun repeats its answers to Paragraphs 1 through 136, as if fully set forth herein.

138.   Denied.

## AFFIRMATIVE DEFENSES

1.   Plaintiff's claims are barred by the statute of limitations.

2.   Plaintiff's claims are barred by the doctrine of estoppel.

3.   Plaintiff's claims are barred by the doctrine of laches.

4.     Plaintiff's claims are barred due to its waiver of these claims.

5.     Plaintiff's claims are barred because of its failure to act in good faith and deal fairly under the contracts at issue.

6.     Plaintiff's claims are barred by unclean hands, including, but not limited to, its negligent performance of its audit herein.

7.     Plaintiff's claims IV and V are barred by the written contract.

8.     Plaintiff's claims are barred because it engaged in conduct constituting duress.

9.     Plaintiff's claims are barred under *United States v. Data Translation, Inc.*, 984 F.2d 1256 (1st Cir. 1992).

Defendant reserves the right to assert additional affirmative defenses as they become known.

Defendant demands a jury trial on all issues.

WHEREFORE, Sun denies all allegations not specifically admitted and denies that the Plaintiff is entitled to any relief whatsoever.  Sun respectfully prays that the Complaint in Intervention against it be dismissed with prejudice, that it be awarded reasonable attorneys' fees and costs and such other and further relief that the Court deems appropriate.

## COUNTERCLAIMS

Sun Microsystems, Inc. ("Sun"), by its undersigned attorneys, brings the following counterclaims and alleges as follows.

1.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331, 1346 and 1367. Venue is proper in this Court under 20 U.S.C. §§ 1391.

\\\DC - 080653/000040 - 2569268 v6

2.      The United States General Services Administration ("GSA") administers a program known as the Multiple Award Schedules ("MAS") program under which GSA enters into contracts with commercial suppliers and service providers for the purpose of providing federal government agencies access to the same supplies and services that are offered in the commercial market.

3.      GSA has entered into thousands of contracts with commercial suppliers and service providers as part of the MAS program.  MAS contracts do not obligate the government to order or purchase anything from the suppliers and service providers that hold these contracts.  Suppliers and service providers that hold MAS contracts are often asked to compete on an order-by-order basis to win business from government agencies, after providing additional discounts beyond those in the MAS contract.  In this sense the discounts that are part of the contract may be viewed as negotiated price ceilings, and government agencies often request and receive additional discounts on a per-order basis.

4.      The subject matter of this action relates to two separate MAS contracts between Sun and GSA and the acts and omissions of the GSA Office of Inspector General ("OIG") in relation to these contracts.

5.      The GSA OIG was established by, and is subject to, the Inspector General Act of 1978.  The GSA OIG is an agency component within the GSA, and the GSA Inspector General reports to the Administrator of the GSA.

6.      The GSA OIG's public website, located at http://oig.gsa.gov, provides that the OIG is "committed to being objective and impartial" and "will not allow conflicts, improper influence or other impediments to interfere" with its work.  It further provides that the OIG will

\\\DC - 080653/000040 - 2569268 v6

carry out its "responsibilities in an ethical manner with the highest level of integrity" and that the OIG's "work will be reliable and add value."

7.    The first MAS contract included Sun's offering of hardware and software support services and was assigned Contract Number GS-35-4547G by GSA (the "Services Contract").   The second contract included Sun's offering of hardware and software products and was assigned Contract Number GS-35F-0702J by GSA (the "Products Contract").   By contract modification dated January 15, 2003, Sun's hardware and software support services offerings were merged into the Products Contract.   Sun currently offers more than 20,000 products and services to the government under the Products Contract.

8.    By letter dated September 8, 2004, the GSA OIG notified Sun that it intended to perform an audit of the Products Contract and Services Contract.

9.    The OIG's letter stated that the purpose of the audit was to determine "the basis of [Sun's] offer, evaluate the accuracy of billings under the contract, and determine whether the contract's Price Reduction and Industrial Funding Fee clauses were complied with." Sun personnel relied upon the OIG's statement regarding its purpose in performing the audit.

10.    The audit was conducted pursuant to a contract clause included in both the Products Contract and Services Contract.  This contract clause, titled Examination of Records by GSA (the "Audit clause"), authorized audits under the contracts solely for overbillings, billing errors, compliance with the Price Reduction Clause and compliance with the Industrial Funding Fee and Sales Reporting clause of the contracts.

11.    The OIG's authority to conduct an audit pursuant to the Audit clause did not extend to information regarding commercial sales practices or policies that the contractor may have submitted to GSA prior to contract award or a modification thereof.  Moreover, the

\\\DC - 080653/000040 - 2569268 v6

OIG's contractual right to conduct the audit did not extend to information unrelated to the compliance areas referenced in the clause.

12.     Notwithstanding the limitations that the Audit clause placed on OIG audits, the OIG required Sun to compile and produce an extensive amount of detailed information that spanned a period of more than seven and one-half years.

13.     Sun personnel expended thousands of hours, and Sun spent significant sums of money to meet the auditors' improper demands.

14.     In addition to being unreasonably broad, the OIG's onerous demands were, unbeknownst to Sun, intended and/or actually used as part of a post-award audit of Sun's pre-award submissions to GSA (including pre-award data relating to contract renewals and modifications) in contravention of the Audit clauses, the OIG's representations regarding its audit's scope, and GSA regulations that prohibit audits of an offeror's pre-award submission.

15.     More than three years after the OIG commenced the audit, the OIG issued two audit reports that purport to present the OIG's findings and conclusions.  One report addressed the Services Contract (Audit Report No. A040250/F/3/C07003) ("Services Contract Audit Report"), and a second addressed the Products Contract (Report No. A040249/F/3/C07005) ("Products Contract Audit Report") (collectively, "Audit Reports").

16.     Sun only recently received copies of a draft of the Audit Reports from the Department of Justice ("DoJ"), and only after portions of the reports appeared virtually verbatim in DoJ's April 12, 2007 complaint in intervention in this action.

17.     Riddled with inaccuracies, deficiencies and misleading omissions, the Audit Reports fall woefully short of the statutorily and contractually mandated standards for OIG audits and other applicable professional standards.

\\\DC - 080653/000040 - 2569268 v6

18.     In addition, the conduct of the OIG personnel during and subsequent to the post-award audit violated those same standards.

**STANDARDS REGULATING OIG CONDUCT**

19.     Section 4 of the Inspector General Act of 1978 requires the OIG "to comply with standards established by the Comptroller General of the United States for audits of Federal establishments, organizations, programs, activities, and functions." See Inspector General Act of 1978, 5 U.S.C. App. 3, § 4(b)(1)(A).  The operative audit standards appear in the Comptroller General's 2003 Government Auditing Standards, also referred to as Generally Accepted Government Auditing Standards ("GAGAS").

20.     The OIG's compliance with the GAGAS is mandatory and the GAGAS standards proscribe numerous non-discretionary requirements for auditors and audit reports. See GAGAS, Note 2 (indicating that statements that include the word "should" are requirements of GAGAS).

21.     The GAGAS require that auditors "need to be professional, objective, fact-based, nonpartisan, and non-ideological in their relationships with audited entities and users of the auditors' reports." See GAGAS Standard 1.22.  The GAGAS further require that auditors "be objective and free of conflicts of interest in discharging their professional responsibilities. Auditors are also responsible for being independent in fact and appearance when providing audit and attestation services. Objectivity is a state of mind that requires auditors to be impartial, intellectually honest, and free of conflicts of interest." GAGAS Standard 1.24.

22.     GAGAS further state that the work of the auditors "[i]n all matters relating to the audit work . . . should be free both in fact and appearance from personal, external, and organizational impairments to independence." See GAGAS Standard 3.03.  The GAGAS

- 18 -

expressly require that auditors "avoid situations that could lead reasonable third parties with knowledge of the relevant facts and circumstances to conclude that the auditors are not able to maintain independence and, thus, are not capable of exercising objective and impartial judgment on all issues associated with conducting and reporting on the work." See GAGAS Standard 3.04. The GAGAS recognize that an auditor's personal impairments to independence might "limit the extent of the inquiry, limit disclosure, or weaken or slant audit findings." Among the personal impairments recognized by the GAGAS are "preconceived ideas toward individuals, groups, organizations, or objectives of a particular program that could bias the audit." See GAGAS Standard 3.07.

23.     The GAGAS also require that SUN's views "concerning the findings, conclusions, and recommendations, as well as planned corrective actions" be included in the Audit Report. See GAGAS Standard 6.41.  Standard 6.42 explains that:

> One of the most effective ways to ensure that a report is fair, complete, and objective is to obtain advance review and comments by responsible officials of the audited entity and others, as may be appropriate. Including the views of responsible officials results in a report that presents not only the deficiencies in internal control, fraud, illegal acts, violations of provisions of contracts or grant agreements, or abuse the auditors identified, but also what the responsible officials of the audited entity think about the deficiencies in internal control, fraud, illegal acts, violations of provisions of contracts or grant agreements, or abuse and what corrective actions the officials plan to take. Auditors should include in their report a copy of the officials' written comments or a summary of the comments received.

The sections of the GAGAS standards cited above are merely illustrative and there are additional standards relevant to this case.

## OIG CONDUCT IN VIOLATION OF GAGAS

24.     In the course of the Sun audits, the OIG staff repeatedly took actions that violated the GAGAS requirements for impartiality and balanced reporting by: (1) inappropriately interjecting themselves into the negotiation of Sun's new GSA contract in 2006 and

demonstrating personal animosity toward Sun and Sun employees during the course of these negotiations; (2) omitting any reference to key contractual documents that undercut a majority of the liability the OIG alleged against Sun; (3) failing to put the number of purported deficiencies in the context of the vast number of Sun's sales transactions; and (4) failing to provide Sun an opportunity to review and respond to their purported findings and failing to include such response in the Audit Report.

<u>OIG'S Interference with Contract Negotiations and Sun's Contract</u>

25.     The Inspector General Act of 1978 requires the OIG to act in an independent and objective manner and precludes OIGs from performing any program operating responsibilities of their respective agencies or departments.

26.     In addition, pursuant to applicable regulations, the authority to negotiate and enter into a federal government contract resides solely with the government contracting officer.  The OIGs are precluded from either negotiating or entering into contracts on behalf of their agency or department.

27.     While the OIG audit was pending, Sun and GSA entered into negotiations to renew and extend the Products Contract.  OIG personnel, however, frequently interfered in these negotiations.

28.     For example, the OIG auditors intimidated one or more GSA contracting officers and interposed themselves to lead contract negotiation sessions with Sun even though the authority to negotiate and enter into the contract resided with the contracting officer and even though the Inspector General Act of 1978 prohibits OIGs from assuming program responsibilities or managerial decisions.  The OIG interfered with the contracting officer's

function and directly proposed its own pricing and its Price Reduction Clause, even though the OIG was not the contracting entity for GSA.

29.     Also, on one or more occasions OIG personnel secretly listened in on one or more of the negotiations sessions by telephone without notifying Sun that they were listening in on the session(s).

30.     On or about May 11, 2005, the GSA contracting officer told a Sun representative that the OIG auditors were emotionally invested into the audit of Sun and that it was going to be difficult to negotiate the renewal of the contract with Sun due to opposition from OIG personnel.

31.     On or about July 13, 2005, the GSA contracting officer told Sun he wanted the Products Contract to include five to ten "tracking customers" for purposes of the contract's Price Reductions clause, which the contracting officer stated was similar to the number of tracking customers used by one of Sun's competitors. The OIG auditors, however, later demanded that GSA and Sun include a much larger number of tracking customers even though the Federal Acquisition Regulation vests the responsibility for such decisions with the contracting officer.

32.     The OIG's lack of neutrality is further reflected in an event that occurred in February 2006 (approximately 17 months after the OIG's commencement of the audit). During a telephone call involving contract negotiations, the Regional Inspector General for Auditing threatened that Sun would never receive another government contract if it did not accept the OIG's proposed price discounts. Sun personnel correctly viewed the statement as a threat of suspension or debarment if Sun did not accept the OIG's proposed pricing.

33.     Sun did not accept the OIG's proposed pricing.  Despite an intervening finding by GSA that Sun is a presently responsible contractor, the OIG has since repeatedly urged Sun's suspension or debarment.

34.     Sun did not agree with the OIG's proposed terms for the contract, and an experienced contracting officer from the agency ultimately entered into contract terms that the Agency determined to be fair, reasonable and advantageous to the government.  OIG personnel disagreed with that determination and have since engaged in multiple efforts to attack the Agency's contract processes, disparage the GSA contract officer who completed the negotiations and attack the terms of the contract that OIG now proposes to audit.

35.     The OIG's lack of neutrality and animus against Sun is further evidenced in more recent events.  On March 28, 2007, the GSA Inspector General testified before Congress that the OIG's role in providing GSA pre- and post-award Audit Reports was to support the contracting officers, who make the contracting decisions.  Nonetheless, as part of his political attacks against the Administrator of GSA, he opined that the Sun contract "should have been terminated" during the course of the OIG audit and cast other aspersions regarding Sun's MAS contract.

36.     After urging Sun's suspension and debarment, on or about June 13, 2007, the OIG sent Sun a letter stating that it intended to conduct yet another audit of Sun, including interviewing Sun employees and reviewing Sun sales and other post- and pre-award information regarding Sun's current contract with GSA.  The OIG intends or intended to conduct this audit notwithstanding that the personnel to perform the audit are the same personnel who performed the previous audits, interfered repeatedly with the contracting officer's function, failed in its

\\\DC - 080653/000040 - 2569268 v6

attempt to coerce Sun into agreeing with the OIG's own discounts and Price Reduction Clause terms and are assisting Plaintiff with its complaint in intervention.

37.   Furthermore, on information and belief, OIG personnel have supplied to the press and to members of Congress and their staffs information regarding Sun and its contracts that is riddled with inaccuracies, deficiencies and misleading omissions.

38.   The new audit request is part of an attempt by the OIG to orchestrate the termination of Sun's Products Contract notwithstanding the lack of any basis for such termination, the prohibitions on the OIG's involvement in such decisions, and OIG's disregard for the GAGAS.

### OIG's Failure To Provide Sun an Opportunity To Review and Respond to the OIG's "Findings"

39.   During the audit Sun repeatedly asked the auditors for an opportunity to respond to any findings, including an opportunity to comment on any audit report.  The auditors, however, repeatedly rejected Sun's requests, and prior to this litigation OIG itself has never provided Sun with an opportunity to review and respond to their purported findings.  In fact, contrary to the procedures outlined in the GAGAS, the GSA OIG has taken the position that it has no obligation and routinely refuses to provide audited companies with its audit findings.

### Inaccuracies, Omissions and Mischaracterizations in Services Contract Audit Report

40.   The OIG willfully or negligently failed to reference and otherwise address in the Services Contract Audit Report several documents that became part of the Services Contract that directly undercut a vast amount of the OIG's allegations regarding "defective pricing."

- 23 -

41.     For example, the Services Contract Audit Report fails to reference the disclosures Sun made to the GSA contracting officer in 1998 and 1999 regarding its commercial sales practices. These disclosures, which were expressly incorporated into Sun's contract by a July 1, 1999 contract modification that the OIG fails to reference, let alone address, directly and squarely contradict and disprove the OIG's audit findings regarding the adequacy of Sun's commercial sales practices disclosures. Among other things, these documents demonstrate that Sun disclosed to GSA commercial discounts that the OIG has publicly claimed that Sun failed to disclose. These errors, including what appear to be intentional omissions of documented disclosures that undercut the OIG's "findings," invalidate or substantially reduce the OIG's purported loss calculation contained in the Services Contract Audit Report attributable to alleged "defective pricing" and alleged violations of the Price Reduction Clause.

42.     In addition, the OIG claims to have based their analysis on sales data for a period of time dating back to October 1, 1996, even though the OIG did not have a Sun sales database covering the subject time period.

43.     The OIG auditors also failed to place their alleged findings in appropriate context as required by GAGAS. For example, in the Services Contract Audit Report, the OIG alleges it identified fourteen Sun end-user customers with volume discounts exceeding 25%, but failed to state that this constitutes less than 0.5% of Sun's end-user customer base and even a smaller percentage of sales transactions.

Inaccuracies, Omissions and Mischaracterizations in Products Contract Audit Report

44.     The OIG willfully or negligently failed to consider or adequately analyze several documents that undercut its allegations contained within the Products Contract Audit Report.

- 24 -

45.     For example, the OIG alleged that "the disclosures Sun made of its sales and marketing practices" for the Products Contract in 1999 "lead the contracting officer to believe that Sun's VEU 'contractual' discounts were the best discounts offered to Sun's best customers." The OIG ignored, however, several relevant documents, including Sun's August 23, 1999 Final Proposal Revision. As part of the Commercial Sales Practices Format clause included with Sun's Final Proposal Revision, Sun disclosed that there were deviations from its standard policies or standard commercial sales practices that resulted in better discounts or lower prices. Sun previously submitted information stating that Sun granted sales allowances and would "negotiate competitive terms and pricing depending upon the circumstances of each situation."

46.     The OIG also alleged that Sun misled the contracting officer regarding the distinction between contractual discounts versus transactional discounts. That distinction, however, was part of negotiations between the GSA contracting officer and Sun. Sun's Final Proposal Revision provided: "Sun agrees to engage in further discussions with the GSA to review the possibility of including, in future GSA contract negotiations, data pertaining to those non-standard or non-contract discounts offered to Sun's VEU customers and to its federal government customers."

47.     The Audit Report also alleged that Sun was liable for alleged deficiencies in its commercial sales practices disclosures for Product categories that were not part of the relevant contract negotiations and did not even exist at the time of those negotiations.

48.     The Products Contract Audit Report contains many additional flaws that Sun has described to the government after having finally received an opportunity to review a draft copy of the report that the plaintiff used for its complaint in intervention.

## COUNT I

## NEGLIGENT PERFORMANCE OF AUDIT

49.     Sun references and incorporates Paragraphs 1 through 48 of this counterclaim as if fully stated herein.

50.     GSA owed a duty to Sun to perform their audits in a manner consistent with federal law and regulation and the highest standards of professionalism and impartiality.

51.     GSA breached that duty by performing the audits discussed herein in a negligent and/or reckless manner.

52.     As a direct and proximate result of said breach of duty, Sun has been damaged in an amount not yet determined but estimated to be in the tens of millions of dollars.

## COUNT II

## BREACH OF CONTRACT

53.     Sun references and incorporates Paragraphs 1 through 52 of this counterclaim as if fully stated herein.

54.     The contracts upon which the GSA audits were conducted contained provisions governing the performance of the audits and, in the alternative, contained an implied covenant of good faith and fair dealing.

55.     GSA's performance of their audits breached those contractual provisions or, in the alternative, the implied covenant of good faith and fair dealing contained in the contracts.

56.     As a result of this breach of contract, Sun has been damaged in an amount to be determined but estimated to be tens of millions of dollars.

\\\DC - 080653/000040 - 2569268 v6

Plaintiff demands a jury trial on all issues.

WHEREFORE, plaintiff seeks a judgment for damages in an amount to be determined, as well as all other remedies available under law and equity.

Dated August 9, 2007                    Respectfully submitted

John G. Lile (62017)
Michelle M. Kaemmerling (2001227)
WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, AR 72201
(501) 371-0808


Ty Cobb
Stuart M. Altman
Michael F. Mason
HOGAN & HARTSON, L.L.P.
555 13th Street, N.W.
Washington, DC 20004
(202) 637-5600

Attorneys for Defendant Sun Microsystems, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on August __9__, 2007, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the

following:

>   Shirley Guntharp Jones
>   E-mail: shirley@wecc-law.com
>
>   Stephen C. Engstrom
>   E-mail: stephen@wecc-law.com
>       *Attorneys for Plaintiffs Norman Rille and Neal Roberts*
>
>   Clarence Daniel Stripling
>   E-mail: dan.stripling@usdoj.gov
>       *Attorneys for intervenor Plaintiff United States of America*

I hereby certify that on August __9__, 2007, I mailed the document and a copy of the

Notice of Electronic Filing ("NEF") by United States Postal Service to the following non-

CM/ECF participants:

>   Craig H. Johnson
>   Packard, Packard & Johnson - Salt Lake City
>   2825 Cottonwood Parkway
>   Suite 500
>   Salt Lake City, UT 84121
>
>   Jacquetta Bardacos
>   Packard, Packard & Johnson
>   Four Main Street
>   Suite 200
>   Los Altos, CA 94022
>
>   Von G. Packard
>   Packard, Packard & Johnson
>   Four Main Street
>   Suite 200
>   Los Altos, CA 94022
>       *Attorneys for Plaintiffs Norman Rille and Neal Roberts*

Michael F. Hertz
U. S. Department of Justice - Civil Division
601 D Street, N.W., Room 9704
Washington, DC 20044

Patricia R. Davis
U. S. Department of Justice - Civil Division
601 D Street, N.W., Room 9704
Washington, DC 20044

Peter D. Keisler
U. S. Department of Justice - Civil Division
20 Massachusetts Avenue NW
Washington, DC 20530
   *Attorneys for Intervenor Plaintiff United States of America*

_____
John G. Lile (62017)
   E-mail: jlile@wlj.com
Michelle M. Kaemmerling (2001227)
   E-mail: mkaemmerling@wlj.com
WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, AR 72201

Ty Cobb
Stuart M. Altman
   E-mail: SMAltman@HHLAW.com
Michael F. Mason
HOGAN & HARTSON, L.L.P.
555 13th Street, N.W.
Washington, DC 20004

*Attorneys for Defendant Sun Microsystems, Inc.*