**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**LITTLE ROCK DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, *ex rel.* NORMAN RILLE and NEAL ROBERTS | |
| Plaintiff, | Case No. 4-04 CV0000986WRW |
| vs. | |
| SUN MICROSYSTEMS, INC., a Delaware Corporation | **FIRST AMENDED COMPLAINT IN INTERVENTION OF THE UNITED STATES** |
| Defendant. | False Claims Act, 31 U.S.C. § 3729, *et seq, 41* U.S.C. §§ 51-58 and Common Law Causes of Action |

The United States of America, by its undersigned attorneys, having intervened in this action, brings this civil action against Sun for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, the Anti-Kickback Act, 41 U.S.C. §§ 51-58, and under common law theories of unjust enrichment, breach of contract, and payment under mistake of fact, and alleges as follows:

## I. JURISDICTION AND VENUE

1. This is an action by the United States against defendant Sun Microsystems, Inc. ("Sun"), pursuant to the False Claims Act, 31 U.S.C. § 3729 et seq., and the Anti-Kickback Act, 41 U.S.C. §§ 51-58 ("AKA"), and at common law.

2. The Court has jurisdiction over this matter pursuant to 31 U.S.C. §§ 3729-3732, and 28 U.S.C. §§ 1331, 1345, and 1355, and its general common law and equitable jurisdiction.

3. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1395, and 31 U.S.C. § 3732.

## II. THE PARTIES

4. The Plaintiff is the United States of America.

5. Defendant Sun is a Delaware corporation that is headquartered in Santa Clara, California. For all relevant time periods, Sun has been doing business in the State of Arkansas and throughout the United States, and more particularly within the geographical limits of the United States District Court, Eastern District of Arkansas. Between 1997 and the present (the "Relevant Time Period"), Sun and its predecessors, and successors (directly or through subsidiaries, affiliates or assigns), directly, through resellers, and using Alliances, Alliance Teams, Alliance Partnerships, and/or Affiliate relationships, has consummated sales to the United States Government as a technology vendor to the United States Government.

6. The False Claims Act, 31 U.S.C. § 3730(b) provides that private persons may file an action pursuant to 31 U.S.C. §§ 3729 et seq. for the private person and the United States against a person violating the Act. The private person initiating such an action is called a "relator."

7. Relator Norman Rille is a citizen and resident of the State of California. Mr. Rille filed this action pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3730(b) on or about September 17, 2004. On December 13, 2006, the Government intervened with respect to the kickback-related claims in Mr. Rille's action.

8. Relator Neal A. Roberts is a citizen and resident of the State of California. Mr. Roberts filed this action pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3730(b) on or about September 17, 2004. On December 13, 2006, the Government intervened with respect to the kickback-related claims in Mr. Roberts' action.

9. Relators have previously made a voluntary disclosure relating to the kickback-related claims referred to herein to the United States Government pursuant to 31 U.S.C. § 3730(e)(4)(B). Relators' Complaint, filed on or about September 17, 2004, made detailed allegations regarding the Relators' direct and independent knowledge relating to Defendants' wrongdoing in connection with the kickback-related claims alleged herein, which comprises their original source allegations.

## III. NATURE OF ACTION - KICKBACK-RELATED CLAIMS

10. The United States Government, along with its departments, subdivisions, prime contractors, and management and operating contractors ("the United States Government" or "Government"), has contracted for the design, development, manufacture and implementation of all kinds and types of information technology systems ("IT Systems"). These IT Systems include substantial quantities of computer hardware, software and maintenance.

11. As part of its efforts to acquire and implement these IT Systems, the United States Government enters into contracts with consulting service companies, which purport to be skilled in contract execution, developing, manufacturing, and/or converting and integrating government systems and/or providing information technology services ("Systems Integration Consultants" or "SI Consultants").

12. The Systems Integration Consultants, who are entrusted and retained to act as the

Government's independent third party objective advisors, are to assist the Government in answering numerous questions about the appropriate technology solutions, including the amount, type and purchasing methods for necessary hardware and software systems and maintenance.

13. In order to increase market share in Government work and for the purpose of consummating sales to the United States Government, Sun has established relationships with alliance partners, including Systems Integration Consultants, and routinely uses those alliances, in what have become known as "teams," "strategic alliances," "alliance teams," "channel relationships," "channel partners," "alliances," or "affiliates" (hereinafter "Alliance(s)" or "Alliance Team(s)" or "Alliance Partnership(s)").

14. The United States Government alleges that during the Relevant Time Period Sun's Alliances have created conflicts of interest, and Sun has wrongfully used its Alliances to enrich itself. For example, Sun has entered into agreements with its Alliance Partners wherein it pays Kickbacks, as defined below, between and among themselves in the nature of anything of value, including, but not limited to, referral fees, influencer fees, systems integration compensation fees, reseller fees, commissions, free or discounted products and/or services, equity ownership, profit sharing, or other benefits ("Kickbacks" or "Kickback Scheme"). Such Kickbacks are paid by Sun to its Alliance Partners in return for their influencing and providing favorable treatment for Sun on Government prime contracts and subcontracts involving Systems Integration Consultants.

15. As a result, millions of dollars of Kickbacks were sought, received, offered and paid between and among Sun and its Alliance Partners in violation of the False Claims Act and other federal statutes and regulations. In furtherance of this activity, Sun expressly or impliedly represented or certified to the Government that it complied with various Anti-Kickback statutes,

organizational conflict of interest laws, and other acquisition regulations, when, in fact, Sun had not and does not comply with such laws and regulations.

16. Those laws and regulations provide, in part, as follows:

a. **The False Claims Act.** The False Claims Act provides that:

> (a) Any person who–
>
> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;
>
> * * *
>
> is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000], plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .
>
> (b) Knowing and knowingly defined. For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information --
>
> (1) has actual knowledge of the information;
>
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
>
> (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

b. **The Anti-Kickback Act.** The Anti-Kickback Act of 1986, 41 U.S.C. §52(2)(AKA), imposes liability on any person who makes a payment to any other person involved in the federal procurement process for the purpose of obtaining favorable treatment. The AKA defines the term "kickback" as follows:

> (2) The term "kickback" means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

The Anti-Kickback Act of 1986, 41 U.S.C. §53, further provides that "[i]t is prohibited for any person–

> (1) to provide, attempt to provide, or offer to provide any kickback;
>
> (2) to solicit, accept, or attempt to accept any kickback; or
>
> (3) to include, directly or indirectly, the amount of any kickback prohibited by clause (1) or (2) in the contract price charged by a subcontractor to a prime contractor or a higher tier subcontractor or in the contract price charged by a prime contractor to the United States.

c. **Organizational Conflicts of Interest.** 48 C.F.R. 9.505, provides, among other things, that:

> The general rules in 9.505-1 through 9.505-4 prescribe limitations on contracting as the means of avoiding, neutralizing, or mitigating organizational conflicts of interest that might otherwise exist in the stated situations . . . Each individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract. The exercise of common sense, good judgment, and sound discretion is required in both the decision on whether a significant potential conflict exists and, if it does, the development of an appropriate means for resolving it. The two underlying principles are—
>
> (a) Preventing the existence of conflicting roles that might bias a contractor's judgment; and
>
> (b) Preventing unfair competitive advantage. In addition to the other situations described in this subpart, an unfair competitive advantage exists where a contractor competing for award of any Federal contract possesses—
>
> (1) Proprietary information that was obtained from a Government official without proper authorization; or

(2) Source selection information (as defined in 2.101) that is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract.

## IV.NATURE OF THE ACTION - DEFECTIVE PRICING

17. The development, manufacture and/or conversion and implementation of these IT Systems also requires the Government's procurement of substantial technology hardware, software, maintenance and technical services, directly and indirectly, from Sun, resulting in the Government's expenditure of millions of dollars. The Government contracts with Sun directly and through resellers of Sun's products and services.

18. During the Relevant Time Period, Sun entered into hundreds of contracts or subcontracts, as well as task orders under two General Services Administration ("GSA") Multiple Award Schedule ("MAS") contracts numbered GS-35F-4547G and GS-35F-0702J, and a contract with the United States Postal Service numbered 102590-98-B-H021 with the United States Government. Additionally, Resellers of Sun products entered into various contracts with GSA, including Government Acquisitions contract GS-35F-0779J and World Wide Technology contract GS-35F-4194D.

19. Sun has made false statements to the Government about its commercial sales practices and the discounts it offers to its commercial customers resulting in improperly negotiated pricing – thus defective pricing–on its sales of products and services to the United States Government. These false statements thus result in inflated and false claims being submitted to and paid by the Government.

20. Millions of dollars of Sun products and services have been sold to the United States Government based upon Sun's defective pricing of those products and services.

## V. SUN'S ALLIANCES AND THE KICKBACK-RELATED CLAIMS

21. As a major Technology Vendor, Sun sells millions of dollars annually to the United States Government of hardware, software, maintenance, and technology services.

22. Under Sun's Master Alliance Agreement and during the Relevant Time Period, Sun designated or appointed its Alliance Agreement Partners as Distributors, Channel Development Providers ("CDPs"), iForce Business Partners ("IFPs"), Global Systems Integrators ("GSI's"), Strategic Government Resellers ("SGR's"), Major Government Resellers ("MGR's"), General Services Administration Resellers ("GSAR's"), and Government System Providers ("GSP's"). Collectively, Distributors, CDPs, IFPs, GSIs, SGRs, MGRs, GSARs, and GSPs shall hereinafter be referred to as "GAPs"–Government Alliance Partners.

23. During the Relevant Time Period, Sun had Alliance Agreements with numerous GAPs, including the following:

| Partner Name | Agreement Type/Number | Year |
|---|---|---|
| Commercial Data Systems | AR-52394-GSP | 2003 |
| Dynamic Systems Inc | AR66069-GSP | 2003 |
| GTSI | AR-57793-GSP & GSAR | 2003 |
| General Microsystems | AR-66087-GSP | 2003 |
| Government Acquisitions | AR-72388-GSP & GSAR | 2003 |
| Government Micro Resources, Inc. | AR-54866-GSP | 2003 |
| Paragon Systems LLC | AR-52297-GSP | 2003 |
| World Wide Technology, Inc. | AR-54992-GSP & GSAR | 2003 |

| | | |
|---|---|---|
| | AR-54992-Technology Integrator | |
| | AR-54992-GSP-LOA | 2004 |
| Digital Consulting Services | AR-52223-GSP | 2003 |
| Accenture | AR-76536-GSI | 2003 |
| Computer Sciences Corp | AR-67316-GSI & iForce GSI<br>Strategic Reseller-STR 101-SRA | 2002 |
| Electronic Data Systems | Government Master–EDS-97-GMA-533<br>AR-78493-GS | 1997<br>2004 |
| General Dynamics | AR51617-Major GSI | 2003 |
| Lockheed Martin | Government Reseller AR-54898 | 2004 |
| PricewaterhouseCoopers, TI | Reseller Sales Agreement | 2001 |
| Northrop Grumman (TRW) | Master Corporate Purchasing<br>IRCA 164-93/M-003R<br>iForce Technology Integrator | 1993 |
| SAIC | AR-54898-GSI | 2002 |

24. During the Relevant Time Period, Sun had overall GAP programs in place whose purpose was to mutually drive business and create revenue and profitability, extend market share and win federal government procurement contracts. These GAP programs led to the execution of numerous teaming agreements, partner agreements, reseller agreements, special pricing agreements, investment commitment agreements, and service agreements with the Sun GAPs.

25. GAPs have been critical to the financial success of Sun because of their ability to drive the demand for Sun technology in the federal government.

## VI. SUN'S PAYMENT OF ALLIANCE BENEFITS

26. In order to increase its federal business and obtain favorable treatment on Government contracts, Sun knowingly pays its GAPs a variety of Alliance Benefits.

**Influence Fees**

27. During the Relevant Time Period, Sun paid its GAPs fees for influencing the Government customer's selection of Sun product and the purchase of that product directly from Sun. Each payment is called an "influence fee."

28. Sun influence fees were paid by Sun to its GAPs for the purpose of, and in return for, the GAPs' favorable treatment and influence in the procurement process.

29. Sun would only pay influence fees if the GAPs were indeed successful in influencing the purchase of Sun products and services directly by the Government agency with Sun.

30. Sun did not disclose to the federal government the terms of the Alliance Agreements and the payment of influence fees.

31. The contracts under which Sun would sell its products and services to the Government were all governed by clauses that required strict compliance with the AKA and were subject to the requirements of the AKA.

32. The AKA prohibits the influence fees that Sun paid to its GAPs.

33. During the Relevant Time Period, Sun knowingly paid influence fees to its GAPs in return for successful influence and favorable treatment on both products and services to the federal government.

34. For one example, Sun had an Alliance Agreement with Pricewaterhouse Coopers

Technology Integration, LLC under which Sun paid PWC $18,139.40, on July 27, 2001, in connection with PWC's efforts on Sun's behalf with the Department of the Army.

35. Similarly, pursuant to Alliance Agreements with Accenture, LLP and Proquire, Inc., Sun paid Accenture/Proquire at least the following influence fees in 2001 and 2002:

| | | |
|---|---|---|
| 2001 | $27,164 | Accenture Contract No. USP-025-93. |
| 2002 | $48,495 | Accenture Contract No. IRS-004-90. |

36. Additionally, Sun paid $73,856.25 in 2003 and $113,383.80 in 2004 to World Wide Technology, Inc. (WWT) in return for WWT's influence in selling Sun services to the Government.

37. Because Sun has not disclosed its payments of influence fees in return for federal contracts, the Government does not have knowledge as to all instances when Sun paid such influence fees.

**Government Target Account Rebate Program**

38. Sun also paid Alliance Benefits to its GAPs pursuant to a program it created called the Government Target Account Rebate Program ("GTARP").

39. This program was designed by Sun to financially motivate SI Consultants to aggressively target government accounts that were not currently Sun customers.

40. Pursuant to its GAP Alliance Agreements, Sun paid its SI Consultants a back-end rebate of 2% in return for successfully selling Sun product to a government customer.

41. The GTARP program at Sun was clearly and admittedly established by Sun to solicit influence and favorable treatment by SI Consultants in the government procurement process.

42. Sun did not disclose the existence of the GTARP program and the payments thereunder to the federal government.

43. Between 2003 and 2006, Sun paid GTARP payments to, among other SI Consultants, Commercial Data Systems, Inc., GTSI Corp., Northrop Grumman/Federal Data Corp., WWT and Paragon Systems, LLC in connection with sales to the United States Government.

**Competitive Knock-Out Rebate Program**

44. Sun also paid Alliance Benefits to its SI Consultants pursuant to a program it created called the Competitive Knock-Out Program (CKO).

45. This program was designed by Sun to financially motivate SI Consultants to aggressively target government accounts that currently had a competitor's product and "knock-out" that competitor and replace it with Sun product.

46. Pursuant to its GAP Alliance Agreements, Sun paid its SI Consultants a CKO back-end rebate of up to 10% in return for successful sales of Sun product to a government customer.

47. The CKO program at Sun was clearly and admittedly established by Sun to solicit both influence and favorable treatment by SI Consultants in the government procurement process.

48. Sun did not disclose the existence of the CKO program and the payments thereunder to the federal government.

49. Between 2003 and 2006, Sun paid CKO payments to Commercial Data Systems, Inc., GTSI Corp., Northrop Grumman/Federal Data Corp., WWT and Paragon Systems, LLC in

connection with sales to the United States Government.

50. Between 2003 and 2006, Sun paid millions of dollars to SI Consultants in Alliance Benefits under its GTARP and CKO programs.

51. Sun's payments of Alliance Benefits in the form of influence fees, GTARP rebates and CKO rebates was structured by Sun for the benefit of Sun and the SI Consultants and the payments were not intended for the benefit of the Government end users of the Sun products and services.

52. Sun's payment of influence fees, GTARP rebates, and CKO rebates in connection with Government contracts are violations of the AKA.

53. Sun knowingly made these payments in order to gain influence and favorable treatment relative to its competitors on Government procurements.

54. Sun's payments of these Alliance Benefits led to false claims being submitted to the United States Government.

55. Sun's payments of influence fees, GTARP rebates and CKO rebates violate the False Claims Act in multiple ways. The cash benefits and discounts, and other things of value, that Sun gave to its GAPs pursuant to its GAP Alliance Agreements are kickbacks in violation of the Anti-Kickback Act, 41 U.S.C. §53, 48 C.F.R. 3.502-2 and 48 C.F.R. 52.203. On numerous occasions, Sun had reasonable grounds to believe that violations of the Anti-Kickback Act may have occurred, and yet failed to promptly report the possible violations in writing to the Inspector General of the applicable agency or other authorized person. These failures constituted further violations of the Anti-Kickback Act, 41 U.S.C. § 57(c)(1).

56. Sun violated the False Claims Act by expressly or impliedly making false

statements, records or certifications in response to the Government requests for proposals that it was in compliance and would continue to comply with the Anti-Kickback Act.

57. Sun's payments of Alliance Benefits to SI Consultants in the form of influence fees, GTARP rebates and CKO rebates further violated the False Claims Act because the claims submitted by Sun were inflated. These claims by Sun that were submitted directly or indirectly to the United States Government were inflated because they included the amounts of the Alliance Benefits.

## VII. SUN'S DEFECTIVE PRICING

58. In June 1997, Sun was awarded a Multiple Award Schedule (MAS) contract by the GSA.

59. The GSA MAS Contract was numbered GS-35F-4547G and was based upon Sun's response to GSA Solicitation FCI-96-DL0001B ("GS-35F-4547G").

60. Government expenditures on GS-35F-4547G were in excess of $150 million in sales by Sun to the United States Government between 1997 and 2002.

61. The contract provides for: a) the maintenance of general purpose commercial IT equipment; b) maintenance for related software; and c) IT professional services.

62. Subsequently, GSA awarded Sun a second MAS contract in August 1999 numbered GS-35F-0702J which provided for the sale of equipment and the sale of software ("GS-35F-0702J").

63. In January 2003, GSA issued a modification to both contracts that led to the merger of GS-35F-4547G into GS-35F-0702J.

64. For the time period August 23, 1999, through August 22, 2004, total sales to the

United States Government under GS-35F-0702J were more than $69 million.

65. The GSA is an agency within the Federal Government responsible for administering the MAS Program for the procurement of commonly-used commercial goods and services.

66. Categories of commercial products and services offered under MAS contracts are assigned Special Item Numbers (SINs). The SINs at issue in this action are 132-33 (software licenses), 132-34 (software maintenance), 132-12 (Equipment Maintenance), and 132-8 (Purchase of Equipment).

67. Under the MAS Program, GSA negotiates prices, terms and conditions with vendors for contracts that are utilized Government-wide. Vendors agree to disclose their commercial pricing policies and practices as a prerequisite to getting an MAS Contract and in exchange for an opportunity to gain access to the broad federal marketplace and the ease of administration that comes from selling to hundreds of Government end users under one central contract.

68. Sun sold over $200 million of products and services directly to federal agencies and other eligible users (ordering agencies or entities) under its MAS contracts. Sun also had substantial indirect sales to the Government under MAS Contracts obtained by some of its resellers.

69. GSA regulations require that vendors or "offerors" seeking an MAS contract provide their commercial pricing policies and practices to GSA during negotiations. 48 C.F.R. § 515.408 (MAS Requests for Information); 48 C.F.R. § 515.408, Figure 515-4 (Instructions for the Commercial Sales Practices Format (CSPF)); 48 C.F.R. § 552.212-70 (Preparation of Offer –

MAS). GSA also requires offerors to disclose if they deviate from their standard written pricing policies, and to include a discussion of the frequency and nature of those deviations. 48 C.F.R. § 515-408(b); 48 C.F.R. § 515.408, Figure 515-4, Column 5. GSA requires offerors to provide pricing information that is current, accurate and complete. 48 C.F.R. § 515.408, Figure 515-4.

70. GSA requires these disclosures so that it has sufficient information to negotiate favorable terms for government purchasers. GSA aims to obtain "Most Favored Customer" status for individual government purchasers, which means that it is entitled to obtain prices comparable to a vendor's best price to its most favored customers making similar purchases. 48 C.F.R. § 538.270.

71. GSA expects government purchasers who order through the MAS Program to receive discounts that reflect the negotiating weight of the aggregate of government business, rather than the smaller expected purchases of the individual agency.

72. MAS contracts include a clause which entitles the United States to seek a refund of overpayments in cases where Sun did not provide current, accurate, and complete pricing data during negotiations that resulted in an inflated GSA price. Price Adjustment – Failure to Provide Accurate Information, 48 C.F.R. § 552.215-72; Price Reduction for Defective Pricing Clause, 48 C.F.R. § 52.215-22.

**Negotiation and Award of the Sun GSA Contracts**

73. The information that Sun provided to the GSA in connection with the negotiation of its two MAS Contracts pertaining to its Commercial Sales Practices (CSP) and its standard and non-standard discounts was knowingly inaccurate and incomplete and misled the GSA contracting officials during negotiations.

74. The GSA relied upon the accuracy of the disclosures in negotiating the Sun MAS Contracts.

75. The defective disclosures by Sun led to Agencies of the United States Government paying significantly higher prices for hardware and software, as well as hardware and software maintenance, during the Relevant Time Period.

**Sun's Defective Disclosures on GS-35F-4547G**

76. More specifically, the CSP information and data submitted by Sun in 1997 for SIN 132-12, equipment maintenance, and 132-34, software maintenance, was inaccurate, incomplete and misled the GSA.

77. On September 11, 1997, Sun wrote a letter to GSA that contained its proposal to add SINs 132-12 and 132-34 to its MAS contract (1997 Proposal).

78. In its 1997 Proposal, Sun provided a detailed explanation of its CSP. Sun also provided a CSP chart. The 1997 Proposal was required by GSA Regulations to disclose all of the relevant discounting policies of Sun relative to its commercial sales for SINS 132-12 and 132-34.

79. In submitting its 1997 Proposal, Sun thereby purported to disclose its standard commercial pricing for these SINs.

80. The GSA contracting officer relied upon the accuracy of the disclosures set forth in the Sun 1997 Proposal.

81. Sun's disclosures of its discounting policies in its 1997 Proposal were false. In fact, during the six month period immediately preceding these negotiations, Sun had offered significantly greater discounts and concessions to its commercial customers of all types.

**Sun's Defective Disclosures on GS-35F-0702J**

82. The CSP information and data submitted by Sun to the GSA on the GS-35F-0702J Contract for SIN 132-8, Purchase of Equipment and 132-33, Perpetual Software License, was also inaccurate, incomplete and misled the GSA CO in negotiating the contract discounts, terms and conditions.

83. GSA contracting officials relied on this inaccurate or defective pricing information to negotiate and award these SINs to Sun on the GS-35F-0702J contract, resulting in significantly higher prices paid by GSA schedule customers.

84. Further, GSA contracting officials relied on these defective disclosures to accept an ineffective price reduction clause that provided no price reduction protection to the Government.

85. As a result of these inaccurate, incomplete and misleading disclosures, the Government was harmed.

86. More particularly, throughout the seven-month period prior to award of the GS-35F-0702J Contract, Sun provided GSA with multiple commercial discounting disclosures and clarifications of these disclosures. These disclosures began in January of 1999, and continued until the award of the contract on August 23, 1999. Sun provided these disclosures and clarifications at the request of the GSA CO and for the purpose of obtaining the award of the contract.

87. The disclosures by Sun did not accurately reflect Sun's actual commercial discounting practices, and misled the contracting officer into accepting unfavorable GSA pricing and a Sun-crafted price reduction clause that harmed the Government.

88. On January 26, 1999, Sun submitted CSP and pricing information for SINs 132-8

Purchase of Equipment and 132-33 Perpetual Software License. In this version of its CSP, Sun stated that its largest Volume End User customers receive a maximum (Standard) percent discount for Category A products (servers and other products). Sun indicated "[t]his discount is offered to a major customer in exchange for concessions above and beyond the normal required by Sun's End User Agreement." Sun also provided in this CSP a precise disclosure of what it called the "highest standard discount." Sun also offered Category H products to GSA stating its standard commercial end-user discount. Sun also submitted sales data on Category B and D products.

89. On March 15, 1999, Sun submitted clarification of its sales and marketing practices in response to a request from the GSA CO. In this letter, Sun provided additional information on the discounts offered to commercial Volume End Users (VEUs).

90. On April 15, 1999, Sun again sent a letter titled "Clarification of Discounts Reflected on the Sun Commercial Sales Information." In this disclosure, Sun stated that the terms and conditions under which the selected VEUs purchase Sun products are based upon negotiations and the requirements of the commercial marketplace. In conjunction with the discounting schedule, Sun stated that volume is only part of the equation in the determination of an appropriate discount. Among other factors, Sun indicated examples of commitments from VEU customers that warranted additional discounts included exclusivity, making Sun the preferred vendor, limited buying locations, and joint marketing of Sun products.

91. The GSA CO again asked for further clarification and Sun submitted a June 30, 1999 letter entitled "Clarification of Discounts Reflected On The Sun Commercial Sales Information Provided On June 25, 1999."

92. This letter followed a June 14, 1999 meeting between GSA and Sun, and addressed GSA's request for "additional information regarding GSA's relative standing in Sun's End User population at the discounts Sun is proposing to GSA."

93. Sun outlined in the June 14 letter that it utilizes an "indirect channel of distribution for the majority of the end user accounts." It further stated "Based upon Sun's discounts to its Master Resellers, however, and a general knowledge of the resellers' required margins, Sun estimates that the majority of the indirect end-users purchase at discounts that are less than those proposed to GSA." Sun further stated that of the Total Indirect Channel and Direct End Users, there were 82 known agreements containing discounts greater than those offered to the GSA for Category A. For Category H products, Sun indicated of the total direct and indirect channel end-users, there were 67 known agreements containing discounts greater than those offered to the GSA.

94. The GSA CO requested additional information in a July 1, 1999 telephone conversation. The contracting officer requested the discount distribution of those Sun customers whose agreements have better than the Category A and the Category H discount being offered to GSA. Sun responded in a letter dated July 13, 1999 with a breakdown of the number of known agreements with discounts greater than those offered to the GSA.

95. In a July 29, 1999 letter from Sun to the GSA CO, entitled "Request for Additional Information," Sun provided the dollar volume of business with each of the customers whose VEU agreements have Category A or Category H products with contract discounts greater than those being offered to the GSA. The dollar volume Sun provided for the VEU agreements listed showed sales volume in excess of the GSA contract sales estimate and included product

purchase only (not support services/maintenance volume). Sun refused to provide the actual customer names, providing only the sales volume. Sun further reiterated that sales volume is just one factor in determining discounts and indicated the discounts offered to customers "also reflect many strategic factors other than volume as we have previously discussed."

96. Throughout the protracted negotiation process from January 1999 until the contract was awarded on August 23, 1999, the disclosures Sun made of its sales and marketing practices led the GSA CO to believe that Sun's VEU "contractual" discounts were the best discounts offered to Sun's best customers. Further, Sun's disclosures indicated it rarely deviated from these "contractual" discounts, disclosing under "Concessions" that "Spot reductions, special packages, extended warranties, price guarantees, etc. are all offered to the Government, GSA, and commercial companies on an as required basis."

97. However, Sun did not accurately disclose the number of VEU contracts at each discount level. Further, contrary to the knowingly false statements by Sun, VEU "contracts" do not accurately portray Sun's actual sales and marketing practices. In fact, Sun's commercial practice prior to the contract award was to grant a substantial number of commercial customers transactional discounts well in excess of its disclosed VEU contract discounts.

98. In reality, Sun's practice was to offer transactional discounts to its commercial customers far in excess of those disclosed to the GSA.

99. The Government was harmed by these inaccurate, incomplete and misleading disclosures.

100. As a result of the contract being negotiated based on the submission of knowingly false CSPs and defective pricing data by Sun, and GSA's acceptance and inclusion of an

ineffective price reduction clause again based on multiple inadequate and misleading statements by Sun, GSA customers paid substantially more during the multiple years of the contract than they would have if Sun had accurately portrayed its actual commercial business practices to the GSA CO during the disclosure period or at the time of negotiation.

101. During the contract period for GS-35F-0702J, Sun also sold approximately $50 million per year of its products to GSA schedule customers through its resellers (approximately 13) that have their own GSA schedule contracts.

102. The pricing that Sun's resellers offer to GSA customers is directly related to the pricing that is negotiated by Sun under its own GSA MAS contract.

103. Therefore, because of Sun's false statements to the GSA about its discounting practices for the sale of products and services, the prices negotiated under Sun's GSA contract are overstated and the prices negotiated by Sun's resellers are also overstated.

**Sun's Defective Disclosures During Merger of GSA Contracts**

104. Sun also made false statements about its commercial practices and discounts to the GSA with respect to the award of Contract Modification 54, effective January 15, 2003, merging Sun's GSA Contract GS-35F-4547G into Contract GS-35F-0702J.

105. This merger added special item numbers (SINs) 132-12, Equipment Maintenance, 132-34, Software Maintenance, 132-50, Training Courses, and 132-51, IT Professional Services, from Contract GS-35F-4547G to the GS-35F-0702J contract with virtually the same discounts as offered under Contract GS-35F-4547G.

106. The CSP data submitted by Sun for maintenance (SIN 132-12, Equipment Maintenance and SIN 132-34, Software Maintenance) was inaccurate, incomplete and

misleading. These defective disclosures resulted in GSA schedule customers paying significantly higher prices for purchases and maintenance during the contract period.

107. As set forth above, the maintenance SINs (132-12, Equipment Maintenance and 132-34, Software Maintenance) were originally awarded as an add-on to Contract Number GS-35F-4547G via Modification 2, dated October 1, 1997.

108. On September 4, 2002, Sun submitted a letter to the GSA CO proposing the merger of its two GSA contracts (GS-35F-4547G and GS-35F-0702J). Effective January 15, 2003, GSA issued Modification 54 which merged contract GS-35F-4547G into GS-35F-0702J. This modification merged the contracts by moving SIN 132-12, Equipment Maintenance, 132-34, Software Maintenance, 132-50, Training Courses, and 132-51, IT Professional Services from Contract GS-35F-4547G to the GS-35F-0702J contract. All discounts remained the same as offered under the GS-35F-4547G contract, except for SIN 132-51, IT Professional Services, where the offered discount increased 5 percentage points.

109. At the time of the contract merger, GSA's standard contractual discount for both maintenance SINs was the same percentage.

110. In its September 4, 2002 letter proposing the merger, Sun submitted new CSP information for maintenance. Sun provided a "Commercial Practice Chart" which outlined its standard and non-standard discounts for each category of customers.

111. Sun's September 4, 2002 CSPs were knowingly false. Sun's false statements misled the GSA CO into accepting unfavorable GSA pricing. In fact, Sun's commercial discounts were higher than those disclosed to the GSA and its discounting policies offered these discounts on a much more standard basis than was disclosed by Sun.

**Sun's Failure to Comply with Price Reduction Clauses on Its MAS Schedules**

112. Both of Sun's GSA MAS Contracts (GS-35F-4547G and GS-35F-0702J) contained "Price Reduction Clauses" that required Sun to immediately offer GSA a price reduction on all government sales if its pricing changed during the life of the contract. Price Reduction Clauses offer GSA price protection that is very important to the structure of the MAS contracts.

113. The primary purpose of the Price Reduction Clause is to ensure that GSA customers will receive the benefits of higher discounts granted by Sun throughout the term of the contract. It is through the provisions of the Price Reduction Clause that the Government is assured of maintaining the originally negotiated position relative to the Technology Vendor's commercial pricing during the GSA multi-year contract period.

114. Sun's Price Reduction Clauses required Sun to notify the GSA contracting officer whenever it offered price reductions to its customers.

115. In addition to making knowing false statements about its CSP that led to defective pricing on its two GSA MAS Contracts, Sun also provided misleading, inaccurate and incomplete data to the GSA that the GSA CO relied upon to accept an ineffective Price Reduction Clause that provided no protection to GSA. During the period 1998 through March 2005, Sun also failed to disclose numerous commercial transactions with discounts in excess of those disclosed to the GSA CO that should have triggered the Price Reduction Clauses in both MAS contracts.

116. With respect to GS-35F-0702J, Sun also falsely stated to the GSA CO on numerous occasions between 2000 and 2004 that it was monitoring and accurately reporting the

discounts it had offered to commercial VEUs.

117. Sun knowingly failed to honor its price reduction obligations under the contracts. Instead of disclosing to GSA the true nature of its discounting practices, which would have resulted in higher discounts and lower prices under the Price Reduction Clause, Sun knowingly continued to submit claims for payment to the United States Government that were inflated.

118. As a result of Sun's misleading and inaccurate submissions as detailed above, Sun violated the terms of its GSA contracts and consequently the Government was not afforded its proper price reductions during the Relevant Time Period.

119. As Sun is and was aware, Sun's GSA pricing was used as a baseline for pricing of other federal contracts for the purchase of Sun products and services.

120. As a result of Sun's misleading and inaccurate submissions as described above, the Government did not obtain appropriate pricing on Sun products and services in connection with the United States Postal Service (contract 102590-98-B-H021), as well as the GSA's contracts with World Wide Technology (contract GS-35F-4194D) and Government Acquisitions (contract GS-35F-0779J), both approved resellers of Sun products and services.

**United States Postal Service**

121. Based on a competitive procurement, on April 10, 1998, Sun was awarded Contract 102590-98-B-H021 to provide certain products and services to the United States Postal Service ("USPS").

122. Notwithstanding the competitive award, Sun's USPS contract required that during the term of the contract Sun's prices must be "no greater than those charged the contractor's most favored customer for comparable quantities under similar terms and conditions."

123. Sun's USPS contract also provided that "[i]f GSA pricing falls below contractor's price to USPS, contractor will provide the lower price."

124. On September 8, 1999, shortly after completing negotiations on the GSA 35F-0702J contract, Sun submitted a Pricing Restructure Proposal to USPS.

125. The Pricing Restructure Proposal, as illustrated in subsequent Sun correspondence from January 14, 2000, sought to bring Sun's pricing under its USPS contract more in line with its newly-completed GSA contracts.

126. As proposed by Sun, on or about February 2, 2000, USPS modified its contract with Sun to bring the discounting levels more in line with the discounting levels previously negotiated by Sun with GSA.

127. As alleged above, the information that Sun provided to GSA in connection with the negotiation of its GSA contracts was knowingly inaccurate and incomplete and misled GSA contracting officials during negotiations.

128. At numerous times during the term of its USPS contract Sun represented to the Postal Service that Sun's pricing to the Postal Service was reasonable because it was as good or better than the pricing provided to GSA.

129. USPS relied upon the fairness and reasonableness of Sun's GSA pricing and Sun's representations to the USPS regarding GSA pricing in paying the prices that it did for goods and services under the USPS contract.

130. During the term of its USPS contract Sun agreed to provide the Postal Service with GSA or better pricing. Sun knew or should have known that by providing defective disclosures to the GSA which resulted in GSA schedule prices being inflated that these defective

disclosures would also cause USPS to pay more for goods and services purchased from Sun.

131. In addition, despite negotiating higher discounts with GSA in August 2005, Sun did not disclose those higher discounts to USPS until November 2005.

**Government Acquisitions**

132. Government Acquisitions ("GA") held GSA contract GS-35F-0779J.

133. In connection with GA's GSA contract, on February 27, 2002, and again on April 28, 2003, Sun authorized GSA to "utilize all data provided in the Commercial Sales Practices, Commercial Practices Chart and Summary of Business Practices" previously submitted by Sun in support of Sun's GSA contract GS-35F-0702J to establish pricing for the GA contract.

134. On April 28, 2003, Sun issued a Letter of Supply to GA, agreeing to supply GA with Sun products and services for resale under Sun's FSS IT Schedule GS-35F-0779J.

135. On September 29, 2003, GSA modified GA's contract to allow GA to supply Sun products and services under its GSA contract at Sun's previously negotiated GSA pricing.

136. The information that Sun provided to GSA in connection with the negotiation of its GSA contracts, its Commercial Sales Practices, Commercial Practices Chart, and Summary of Business Practices was knowingly inaccurate and incomplete and misled GSA contracting officials during negotiations.

137. GSA relied upon the accuracy of Sun's disclosures in agreeing to allow GA to supply Sun products and services under its GSA contract at Sun's previously negotiated GSA pricing.

138. Sun's defective disclosures led to agencies of the United States Government paying significantly higher prices for products and services, during the Relevant Time Period.

**World Wide Technology**

139. World Wide Technology ("WWT") held GSA contract GS-35F-4194D.

140. Following the execution of Sun's GSA GS-35F-0702J contract, on September 23, 1999, WWT requested a "Government Only" permanent price reduction for its Sun products and services.

141. On September 23, 1999, WWT provided GSA with a Pricing Spreadsheet, which included Sun's recently obtained discounts on GS-35F-0702J contract. WWT noted that the discounts were "GSA negotiated prices." WWT noted to GSA that the "data submitted are current, accurate, and complete representations of actual transactions to the date the data is submitted."

142. On October 1, 1999, GSA modified the WWT contract to change the pricing structure of Sun products as of October 5, 1999.

143. Sun continued to provide WWT and GSA with its commercial sales data in connection with WWT's GSA contract.

144. On February 27, 2002, Sun provided WWT with a Letter of Supply for the WWT contract, agreeing to supply WWT with certain Sun products for resale. Attached to that letter was a current Sun commercial price list.

145. On February 27, 2002, Sun authorized GSA to "utilize all data provided in the Commercial Sales Practices, Commercial Practices Chart and Summary of Business Practices" previously submitted by Sun in support of its GS-35F-0702J contract to establish pricing for the WWT contract.

146. The information that Sun provided to GSA in connection with the negotiation of

its GSA contracts, its Commercial Sales Practices, Commercial Practices Chart, and Summary of Business Practices was knowingly inaccurate and incomplete and misled GSA contracting officials during negotiations of the WWT contract.

147. GSA relied upon the accuracy of Sun's disclosures in agreeing to allow WWT to supply Sun products and services under its GSA contract at Sun's previously negotiated GSA pricing.

148. Sun's defective disclosures led to agencies of the United States Government paying significantly higher prices for products and services, during the Relevant Time Period.

**CLAIMS**

**<u>COUNT I</u>**

(VIOLATIONS OF THE FALSE CLAIMS ACT)

149. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 148 above, as if fully set forth herein.

150. Accordingly, Sun has violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (a)(2) by:

a. Knowingly presenting or causing to be presented to the United States Government, directly or indirectly, false or fraudulent claims to be paid or approved, directly or indirectly, by the United States Government (31 U.S.C. § 3729(a)(1));

b. Knowingly making, using, or causing to be made or used, or presenting false records or statements and/or false certifications to obtain contracts/subcontracts and/or the payment of false or fraudulent claims to

be paid or approved by the United States Government (31 U.S.C. § 3729(a)(2)); and

c. Knowingly presenting or causing to be presented false claims for payment, including invoices for payment related to the two Sun MAS contracts, the USPS contract and the GA and WWT reseller contracts, which were inflated by reason of the false pricing information submitted as described in this Complaint, in violation of 31 U.S.C. §3729(a)(1)(2).

151. The United States Government, upon presentation of such claims for payment, whether directly or indirectly, remitted payment despite the false nature of such claims.

152. Pursuant to 31 U.S.C. § 3729(a), Sun is liable to the United States Government for a civil penalty of not less than $5,500, and not more than $11,000 for each violation of the FCA committed by Defendants.

153. The United States Government has further sustained damages, and will yet sustain damages up to the date of trial in an amount yet to be determined. Pursuant to 31 U.S.C. § 3729(a) Sun is liable for three times the amount of all such damages sustained by the United States Government.

**COUNT II**

(VIOLATION OF THE ANTI-KICKBACK ACT)

154. Paragraphs 1 through 153 of this Complaint are hereby realleged and incorporated as though set forth in full herein.

155. This is a claim against Sun under the Anti-Kickback Act.

156. The arrangements and activities described above in connection with Sun's

Alliance Benefit payments were knowingly carried out by Sun "for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract," 41 U.S.C. §52(2), and thus constituted illegal kickbacks in violation of 41 U.S.C. §53, as well as in violation of Sun's contracts with the Government.

157. By reason of the conduct alleged herein, Sun knowingly engaged in conduct prohibited by 41 U.S.C. §53 with respect to kickbacks paid to SI Consultants by Sun on federal contracts and subcontracts.

158. By reason of the conduct alleged herein, Sun knowingly caused, directly or indirectly, the kickbacks to be included in the charges to the United States, in violation of 41. U.S.C. §53(3).

159. Pursuant to section 55(a)(1)(A), the United States is entitled to recover from Sun double the amount of the kickbacks plus $10,000 per kickback.

160. In the alternative, pursuant to section 55(a)(2), the United States is entitled to recover the amount of the kickbacks from Sun.

**COUNT III**

(BREACH OF CONTRACT)

161. Paragraphs 1-160 of this complaint are realleged and incorporated as though set forth in full herein.

162. By reason of the actions described above, Sun materially breached the United States' contracts by not providing the services for which it was contracted. Sun billed in violation of the terms of those contracts, including specifically, the violations of the AKA.

163. Sun further breached its contracts with the United States by failing to furnish current, accurate, and complete data regarding commercial prices and discounts during negotiations for the two Sun MAS contracts, the USPS contract and the GA and WWT reseller contracts, involved herein.

164. By reason of these breaches, the United States has been damaged.

**COUNT IV**

(PAYMENT BY MISTAKE)

165. The United States repeats and realleges each allegation as set forth above in paragraphs 1 through 164.

166. Defendant Sun caused the United States to make payment for Sun products and services based upon the United States' mistaken belief that the requirements of its contracts and subcontracts pursuant to which Sun was being paid had been met and that the Sun contracts were without violations of the AKA. In such circumstances, the payments by the United States to Sun was by mistake and not authorized.

167. The United States awarded the two GSA MAS contracts to defendant and made inflated payments on claims arising from the contracts in reliance of Sun's representations regarding discounts and prices granted to defendant's other customers, and was unaware that defendant's other customers received discounts and prices better than those reported to or offered to the United States.

168. Defendant's misrepresentations were material both to the MAS awards of the contracts and to the payments made under the contracts.

169. As a result of those mistaken payments, the United States has sustained damage.

## COUNT V

(UNJUST ENRICHMENT)

170. Paragraphs 1-169 are realleged and incorporated as though set forth herein.

171. By reason of the United States' payments under the its contracts and subcontracts, Sun received money to which it was not entitled and has thereby been unjustly enriched in an undetermined amount.

## PRAYER

WHEREFORE, Plaintiff, United States, prays for judgment against Defendant Sun as follows:

A. On Count I, pursuant to the FCA, judgment against Sun for triple damages sustained by the United States, plus civil penalties as are allowable by law, and all other proper relief,

B. On Count II, pursuant to the AKA, judgement against Sun for double the amount of the prohibited kickbacks, plus civil penalties as are allowable by law in the amount of $10,000 per violation, pre-judgment and post- judgment interest, and costs, or in the alternative, pursuant to 41 U.S.C. §55(a)(2), the amount of the prohibited kickbacks, plus pre-judgment and post-judgment interest, and costs.

C. On Counts III-V, judgment against Sun for the damages sustained, all profits earned by virtue of the wrongdoing, plus pre-judgment and post- judgment interest, and costs.

D. Such other and further relief as is just and proper.

THE UNITED STATES DEMANDS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.

UNITED STATES OF AMERICA

TONY WEST
Assistant Attorney General

JANE W. DUKE
United States Attorney

SHANNON S. SMITH
Assistant United States Attorney
425 W. Capitol Avenue
P.O. Box 1229
Little Rock, AR 72203

JOYCE R. BRANDA
PATRICIA R. DAVIS
PATRICK M. KLEIN (AZ #019850)
DANIEL H. FRUCHTER
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
(202) 305-2447
Patrick.Klein2@usdoj.gov

Attorneys for the United States

Date: May 18, 2010

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the following:

Craig H. Johnson - cjohnson@packard.com
Lon D. Packard - lpackard@packard.com
Daniel W Packard - dpackard@packard.com
Ronald D. Packard - rdpackard@packard.com
Von G. Packard - vpackard@packard.com
Daniel S. Fruchter - dfruchter@packard.com
Jacquetta F. Bardacos - jbardacos@packard.com
Philip J. Favro - pfavro@packard.com
Jeffrey Wexler - jwexler@luce.com
Michael Bierman - mbierman@luce.com
Shirley Guntharp Jones - shirley@wecc-law.com
Stephen C. Engstrom - stephen@wecc-law.com
Stuart M. Altman - SMAltman@hhlaw.com
Michael F. Mason - MFMason@hhlaw.com
Phillip Metcalf - POMetcalf@hhlaw.com
Michelle Marie Maemmerling - mkaemmerling@wlj.com

DATE: May 18, 2010

[signature]