**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

UNITED STATES OF AMERICA, ex rel.                                      PLAINTIFFS
NORMAN RILLE and NEAL ROBERTS

v.                                      4:04-CV-00986-BRW

SUN MICROSYSTEMS, INC.                                      DEFENDANT

<u>ORDER</u>

Pending is a Motion to Dismiss Certain Relator Claims for Lack of Subject Matter

Jurisdiction (Doc. No. 249) filed by the United States (the "Government").  Also pending is Sun

Microsystem, Inc.'s ("Sun") Motion to Dismiss Relator Claims for Lack of Subject Matter

Jurisdiction (Doc. No. 252).  Responses and replies have been filed.[1]  For the reasons set out

below, both motions are DENIED.

**I.       BACKGROUND**

In September 2003, the General Service Administration ("GSA") Office of Inspector

General ("OIG") received a fraud hotline complaint alleging that Sun gave large commercial

customers more substantial discounts than it gave the Government under the GSA schedule

contract for Sun's services.[2]  Norman Rille and Neal Roberts ("Relators") did not submit the

complaint.  The complaint was forwarded to the GSA OIG audit office in Philadelphia,

Pennsylvania.  The office initiated an audit and on September 8, 2004 requested information

from Sun.

---

[1]Doc. Nos. 263, 264, 265, 274, 292, 296, and 311.

[2]Doc. No. 249.

That same day, Relators hand-delivered a copy of their False Claims Act[3] pre-filing disclosure statement[4] to Don Williamson, an attorney at the Department of Justice ("DOJ").[5] Neither Relators nor their counsel were aware of the GSA OIG's ongoing audit of Sun. Rather, apparently the DOJ asked the GSA OIG to get involved in this case. As a result, Marie Ingol, an agent with the GSA OIG, participated in more than one strategy conference.[6] The GSA OIG's audit office in Philadelphia, however, became aware of this lawsuit only around October, 2006.[7] So, it seems that the GSA OIG was investigating Sun on two separate fronts, and that one investigator did not know of the other's efforts until much later.

Relators filed this *qui tam*[8] action on September 17, 2004.[9] In a nutshell, Relators alleged that Defendants formed strategic alliances to drum up Government business; that members of the alliances received certain benefits; that the actions in connection with the benefits were

---

[3] 31 U.S.C. §§ 3729, *et seq.*

[4] Pre-filing disclosure is required to "escape the jurisdictional bar" if information has been publicly disclosed. See *United States ex rel. Ackley v. IBM*, 76 F. Supp. 2d 654, 668 (S.D. Md. 1999) (internal citations omitted); 31 U.S.C. § 3730(e)(4)(B).

[5] Doc. No. 274. By this time, Relators already had retained counsel. Relators assert that in June and July, 2004, their counsel made verbal disclosures about this case to Howard Daniels and Chris Hendrickson, both of the DOJ.

[6] Doc. No. 274. In August 2006, Maire Ingol apparently attended a "strategy conference" in this case.

[7] Doc. No. 249. Declaration of James M. Corcoran, Regional Inspector General for Auditing of the GSA OIG's Mid-Atlantic Field Audit Office in Philadelphia, Pennsylvania.

[8] "*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who pursues this action on our Lord the King's behalf as well as his own.' The phrase dates from at least the time of Blackstone." *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 769 (2000). "[W]hen a portion of the penalty recovered went to the person or persons informing, and a portion to the sovereign, the action was styled a 'qui tam' action." *Williams v. Wells Fargo & Co. Express*, 177 F. 352, 355 (8th Cir. 1910) (internal citation omitted).

[9] Doc. No. 1.

wrongful; and that as a result of those actions, the Government overpaid.  In 2007, nearly three

years after Relators filed their complaint, the Government intervened in this case.[10]  The

Government and Sun settled in January, 2011.[11]  The settlement agreement resolved two types of

fraud claims: kickbacks and defective pricing.[12]

## II.    DISCUSSION

Now, after litigating for years, settling the case, and filing a stipulation of dismissal, the

Government maintains that Relators' defective pricing claims are prohibited under the False

Claims Act by the public disclosure bar,[13] and asks that I dismiss Relators' defective pricing

claims for lack of jurisdiction.[14]  Sun adopts the Government's arguments in connection with

Relators' defective pricing claims, and further asks that I dismiss Relators' kickback claims for

---

[10]Doc. No. 47.  The Government intervened on April 12, 2007.

[11]Doc. No. 242.  The Government and Sun filed a stipulation of dismissal in February, 2011.

[12]*Id.*

[13]31 U.S.C. § 3730(e)(4)(A), which provides:

No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General of the person bringing the action is an original source of the information.

I cite the FCA as it existed at the time Relators filed their complaint.  On March 23, 2010, 31 U.S.C. § 3730(e)(4) was amended, but the legislation is silent as to retroactivity.  *See* Section 10104(j)(2) of the Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119; *Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1889 n.1 (2011).

[14]Doc. No. 249.

lack of jurisdiction, also based on the public disclosure bar.[15]  I consider these requests under

Federal Rule of Civil Procedure 12(b)(1) as a factual challenge to this Court's jurisdiction.[16]

    Under the False Claims Act ("FCA"), federal courts lack jurisdiction over a *qui tam*

action if the allegations in a relator's complaint have been publicly disclosed in a federal

hearing, in a federal report or audit, or in the news media -- unless the relator is an original

source of the information.[17]  In the Eighth Circuit, when a relator's complaint alleges fraud, the

public disclosure bar is not triggered by information about a transaction unless the information

presents a clear indication of foul play.[18]  "The jurisdictional bar to an FCA claim exists only

'when the essential elements comprising [the] fraudulent transaction have been publicly

disclosed so as to raise a reasonable inference of fraud'; to bar the action this disclosure must

reveal the 'critical elements of the fraudulent transaction themselves.'"[19]

    In analyzing public disclosure and original source, a court must first consider:

"(1) Have allegations made by the relator been 'publicly disclosed' before the *qui tam* suit was

brought? (2) If so, is the *qui tam* suit 'based upon' the public disclosure? and (3) If so, was the

---

[15]Doc. Nos. 252, 253.

[16]*Osborn v. United States*, 918 F.2d 724, 729-30 & n.6 (8th Cir. 1990) ("Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.") (internal citations omitted).

[17]*United States ex rel. Kinney v. Stoltz*, 327 F.3d 671, 674 (8th Cir. 2003) (internal citation omitted).

[18]*United States ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1514 (8th Cir. 1994).

[19]*United States ex rel. Hixson v. Health Mgmt. Sys.*, 613 F.3d 1186, 1188 (8th Cir. 2010).

relator an 'original source' of the information on which the allegation was based?"[20]  It is

necessary to determine if a relator is an original source only if there has been public disclosure.[21]

If there was public disclosure, the original source analysis has three parts: "the relator's

knowledge of the information must be (1) direct and (2) independent, and (3) the relator must

have voluntarily provided the information to the Government before filing suit."[22]  Direct

knowledge is immediate knowledge -- knowledge that is "unmediated by anything but [the

plaintiff's] own labor."[23]  Independent knowledge is knowledge not derived from the public

disclosure.[24]  "If the relator has direct knowledge of the true state of the facts, it can be an

original source even though its knowledge of the misrepresentation is not first-hand."[25]

## A.      Defective Pricing

---

[20]*Minn. Ass'n of Nurse Anesthetists v. Allina Health System Corp.*, 276 F.3d 1032, 1042 (8th Cir. 2002) (quoting *United States ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1512-14 (8th Cir. 1994) (Judge Magill's dissent in *Rabushka* disagrees with the majority's interpretation of *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994), in particular the interpretation that *Springfield* requires the disclosure of all elements of a fraudulent transaction.  *Rabushka*, 40 F.3d at 1514.  While Judge Magill agrees with the majority "that the district court's application of the jurisdictional bar whenever there is disclosure of the 'subject transactions' was too broad, [he] believe[s] that 'in its attempt to evade Scylla, [the panel majority] steered precipitously close to Charybdis.'" *Id*. at 1515 n.3.)

[21]*United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994).

[22]*Allina Health System Corp.*, 276 F.3d at 1042-43.

[23]*Id*. at 1048-49 (quoting *Wang v. FMC Corp.*, 975 F.2d 1412, 1417 (9th Cir. 1992)).

[24]*Id*. at 1048.

[25]*Id*. at 1050 (citing *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 656-67 (D.C. Cir. 1994)).

### 1.     2004 Complaint

The Government contends that the Relators' September 17, 2004 complaint "raised no defective pricing allegations whatsoever" and that "the words and phrases 'pricing,' 'defective pricing,' 'GSA,' 'commercial sales,' 'current accurate, and complete,' and other terms and phrases typical of any GSA defective pricing claim" do not appear in the complaint.[26]  The Government maintains that defective pricing information was publicly disclosed by August, 2005 in GSA OIG audit-related discussions with Sun and in two Federal Computer Week articles,[27] and that Relators amended their complaint to include defective pricing claims only in October, 2006.[28]

In broad terms, under the Truth in Negotiations Act ("TINA") and the Federal Acquisition Regulations ("FARs") a government contractor must submit cost and pricing data to the Government along with any proposal over a certain dollar amount; the contractor must also certify that the data is "accurate, complete and current."[29]  If the data submitted by a contractor is not accurate, complete, and current, then the Government may bring a defective pricing action against the contractor.[30]  The Government carries the burden of proof in a defective pricing claim

---

[26]Doc. No. 249.

[27]Federal Computer Week is an IT-oriented online publication.  See http://fcw.com/Home.aspx .  One article cited by the Government, *GSA Nearly Delists Sun Microsystems*, was published on August 16, 2005.  Available at http://fcw.com/articles/2005/08/16/gsa-nearly-delists-sun-microsystems.aspx?sc_lang=en.  The second article that the Government cites, *Sun Narrowly Escapes GSA Delisting*, was published on August 22, 2005. Available at http://fcw.com/articles/2005/08/22/sun-narrowly-escapes-gsa-delisting.aspx?sc_lang=en.

[28]Doc. No. 249.

[29]10 U.S.C. § 2306a.

[30]*Id.*

and must establish by a preponderance of the evidence that: (1) the data at issue is "cost or pricing data" within the meaning of the TINA; (2) the cost or pricing data was not meaningfully disclosed to the Government; and (3) the Government detrimentally relied on the data, which resulted in overpayment.[31]

Under the False Claims Act, a person who presents a fraudulent or false claim to the government faces civil liability.[32]   "The archetypical *qui tam* FCA action is filed by an insider at a private company who discovers his employer has overcharged under a government contract."[33]   However, FCA actions have also been sustained under the theory of "false negotiation, including bid rigging and defective pricing," among others.[34]   In the FCA context, to prevail on a defective pricing claim the Government must prove by a preponderance of the evidence that the contractor submitted "cost or pricing data" within the meaning of the TINA, that the contractor failed to make a meaningful disclosure, and that the contractor acted with the requisite intent.[35]

With this in mind, I turn to Relators' 2004 complaint, which alleges that the Government contracts with consultants for information technology services ("Systems Integration Consultants").  To implement the plans or services of the Systems Integration Consultants, the Government must procure hardware, software, or technical services from technology companies ("Technology Vendors").  The complaint continues that the TINA, FARs, Anti-Kickback

---

[31]*See* 10 U.S.C. § 2306a; *United States ex rel. Campbell v. Lockheed Martin Corp*., 282 F. Supp. 2d 1324, 1331-32 (M.D. Fl. 2003).

[32]31 U.S.C. § 3729.

[33]*United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996).

[34]*Id.*

[35]See *United States v. JT Construction Co.*, 668 F. Supp. 592, 593 (W.D. Tex. 1987).

provisions,[36] and FCA, as well as the contracts between the Government and Systems Integration Consultants, require that the Systems Integration Consultants and Technology Vendors be "truthful in negotiations, and to certify that the cost or pricing data they proffer to the Government is current, accurate, and complete."[37]

The 2004 complaint alleges that Systems Integration Consultants and Technology Vendors established alliances to consummate sales to the Government.  According to the complaint, participation in a kickback scheme was a prerequisite to inclusion in an alliance, and alliance benefits were secret.  While the 2004 complaint repeatedly refers to kickbacks, the complaint explains that  "discounted products" were a form of kickback in the kickback scheme.[38]  Relator Rille apparently learned of Sun's alliance involvement while Rille was employed by NCR and Accenture -- before filing the 2004 complaint.

The 2004 complaint continues that "[i]n furtherance of this Kickback Scheme and conspiracy, Defendants, and each of them, expressly or impliedly represented or certified to the Government that they complied with various Anti-Kickback statutes, FARs, and TINA when, in fact, they had not, and do not, comply with such laws and regulations."[39]  The 2004 complaint specifically alleges that Sun contracted with the Government and was required to comply with the Anti-Kickback statutes, FCA, TINA, and FARs.  The complaint further alleges that Defendants had knowledge that their "negotiations, statements, records, claims, invoices for payment and certification of compliance . . . with the Anti-Kickback statutes, FARs, and TINA

---

[36]41 U.S.C. § 51, *et seq.*

[37]Doc. No. 1.

[38]*Id.*  At least one exhibit to the complaint shows discounted products.

[39]*Id.*

were false, and/or acted in reckless disregard for their truth, or acted with deliberate ignorance of their falsity."[40]

Defendants allegedly submitted false claims to the Government in violation of the FCA, Anti-Kickback statutes, FARs, and TINA; the Government relied on the allegations; and, as a result, the Government overpaid.  Considered as a whole, the 2004 complaint contains allegations of defective pricing.

### 2.      Public Disclosure

The Government contends that public disclosure occurred through audit-related conversations between the GSA OIG and Sun, and in the media.  James M. Corcoran, Regional Inspector General for Auditing of the GSA OIG's Mid-Atlantic Field Office in Philadelphia, Pennsylvania, declared that the GSA OIG's audit revealed that Sun had not provided the GSA with current, accurate, or complete customer sales practice information; had not complied with price reduction clauses in its GSA schedule contracts; and had not administered its GSA contracts in accordance with their terms.[41]  Corcoran stated that between December 2004 and December 2006, these findings were discussed at length with Sun employees -- both employees

---

[40]*Id.*

[41]Doc. No. 249.  Corcoran's statement, reads, in relevant part:

By August 2005, when Sun's GSA contract was up for renewal, while we had not completed or issued our audit reports, we had documented significant problems with Sun's negotiation and administration of its GSA contracts.  Specifically, by August 2005, our work revealed that Sun: 1) had not provided GSA with current, accurate, or complete customer sales practice information in negotiating the pricing of its GSA contracts in 1997 and 1999; 2) had not complied with price reduction clauses of its GSA contracts by offering significantly better pricing to many of its commercial customers than it offered to GSA; and 3) had not administered its GSA schedule contracts in accordance with their terms and provisions.

believed responsible for the inaccurate pricing and employees not suspected of involvement with any wrongful activity.[42]

The two articles that the Government contends resulted in public disclosure set out that Sun granted commercial clients deeper discounts than the Government, which is contrary to the GSA's standard price-reduction clause obligating contractors to give the Government equal or bigger discounts.[43]

I first note that both the audit-related discussions and the articles occurred after Relators filed the 2004 complaint.  Further, as set out above, to fall within the public disclosure bar in the Eighth Circuit, the disclosure "must reveal the 'critical elements of the fraudulent transaction themselves.'"[44]  There is little information in the record about what, exactly, was discussed with which Sun employees.  While it seems Sun employees were made aware that Sun did not provide accurate pricing information and did not comply with its GSA schedule contract, I cannot find that Corcoran's statement clearly indicates that fraud was involved.  Likewise, the two Federal Computer Week articles lack the critical elements of a fraudulent transaction; neither article clearly indicates fraud.  Based on the record, there was not enough information in the public domain to expose any alleged fraudulent transaction.

Even if there was public disclosure, Relators were an original source.  Relator Rille was formerly employed by Accenture, LLP, a defendant in another *qui tam* case filed by Relators.[45] While employed by Accenture, Rille became aware of contracts between Accenture and Sun that

---

[42]*Id.*

[43]*Id.*

[44]*United States ex rel. Hixson v. Health Mgmt. Sys.*, 613 F.3d 1186, 1188 (8th Cir. 2010).

[45]*United States ex rel Rille v. Accenture LLP*, *et al.*, No. 4:04-CV-00985-BRW (E.D. Ark.)

are relevant to the defective pricing claim.[46]  Relators possessed hundreds of thousands of pages

of documents at the onset of their *qui tam* cases.  Certain documents evidenced the alleged

strategic alliances and the nature of the alliance.[47]  Relators admit not having seen other

documents at issue.  Nonetheless, Relators had direct knowledge of the "true state of the facts"

and can be an original source even though their knowledge was through documents that

referenced other documents at issue.[48]

Considering the 2004 complaint, the nature of the disclosures, and my finding that

Relators are an original source, the Government's motion to dismiss Relators' defective pricing

claims is DENIED.  I note that the Government also asked for dismissal under Federal Rule of

Civil Procedure 9(b).  The time for Rule 9(b) motions has passed.

## B.      Kickbacks

Sun joins in the Government's request that Relators' defective pricing claims be

dismissed and further asks that Relators' kickback claims be dismissed.  Sun maintains that its

system of discounts was widely publicized in the press, and that the Government was aware of

its practices well before Relators filed their complaint.[49]  In support of its argument, Sun

submitted around 250 pages of documents consisting of articles, deposition excerpts, and

government reports.[50]  None of the documents, however, disclose the critical elements of fraud or

clearly indicate that fraud was involved.  And, as set out above, even if there was public

---

[46]Doc. No. 274.

[47]*Id.*

[48]*Allina Health System Corp.*, 276 F.3d at 1050. (citing *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 656-67 (D.C. Cir. 1994)).

[49]Doc. No. 253.

[50]Doc. No. 254.

disclosure, Relators qualify as an original source.  Accordingly, Sun's Motion to Dismiss is DENIED.

## CONCLUSION

Based on the findings of fact and conclusions of law above, the Government's Motion to Dismiss (Doc. No. 249) and Sun's Motion to Dismiss (Doc. No. 252) are both DENIED.

IT IS SO ORDERED this 30th day of January, 2012.


/s/Billy Roy Wilson
UNITED STATES DISTRICT JUDGE